IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| HSL FILLY SHIPPING LIMITED; and, <br> FLEET MANAGEMENT LIMITED <br><br> v. <br><br> VOPAK TERMINAL—DEER PARK, INC. | § <br> § <br> §    C.A. No. 4:22-CV-00066 <br> §    Admiralty - Fed. R. Civ. P. 9(h) <br> § <br> § <br> § |

**PLAINTIFFS' RESPONSE TO VOPEK TERMINAL – DEER PARK, INC.S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Vopak's Motion for Summary Judgment grossly mischaracterizes Plaintiffs' claims, seeks to invoke a "wharfinger duty" that has no application to this case, and ignores the fact that its own documents and contradictory testimony from Vopak personnel raise genuine issues of material fact. Vopak's motion should be denied.

**I.
<u>FACTUAL BACKGROUND</u>**

1.    On May 30, 2019, the *M/T Fairchem Filly* called at Vopak Terminal – Deer Park, Dock No. 5, in the Port of Houston to discharge – among other cargo – a parcel of hexene. Because oxygen negatively affects the purity of hexene, it is transferred under a "blanket" or "pad" of inert gas, in this case, nitrogen.

2.    Prior to discharge, a Key Meeting was held by Vopak's Person-in-Charge ("PIC), Rigoberto Ramirez, and the vessel's Chief Officer ("C/O"). However, even though Ramirez was conducting the meeting, he would not actually be present during the cargo operation as he was going off-shift and the cargo movement would be handled by a relief PIC. (*See* Exhibit "1," Deposition of Rigoberto Ramirez at p. 14, ll. 12-17.) Ramirez agreed it would have "made sense" to have waited for the relief PIC to conduct the Key Meeting, but that "time is money." (*See id*. at p. 20, l. 25 to p. 21, ll. 1-12.)

3.      During the Key Meeting, Mr. Ramirez and the C/O completed a Ship/Shore Safety Checklist (a vessel form) and a Declaration of Inspection (a Vopak form). (*See id.* at p. 18, ll. 5-9; p. 32, ll. 24-25 to p. 33, ll. 1-8.)  Between those two forms, Ramirez and the C/O reviewed and initialed 182 topics related to the safety, procedure, and movement of the cargo at issue, including the terminal's supply of nitrogen to the vessel. (*See* Exhibit "2," Ship/Shore Safety Checklist; Exhibit "3" Declaration of Inspection.) On neither of those documents, and in none of the 182 topics reviewed does it state that "the vessel is in control of the nitrogen." Further, nowhere on either of those documents is it notated that Vopak would be using a four-inch hose to supply the nitrogen. (*See* Exhibit "1" at p. 35, ll. 18-25 to p. 36, l. 1; Exhibits "2," "3," Exhibit "4," Deposition of Jeremy Zwahr at p. 32, ll. 9-17.)

4.      Critically, what was written onto both the Ship/Shore Safety Checklist and the Declaration of Inspection by Mr. Ramirez, Vopak Supervisor Jeff Moravek, and the C/O was that a nitrogen blanket would be supplied by the terminal. (*See* Exhibit "1" at p. 24, ll. 16-19; p. 36, ll. 2-15; Exhibit "2" at p. 4 Item 50, p. 6 Item 11; Exhibit "3" at p. 5 Item 29' Exhibit "5", Testimony of C/O Lin Nyan at p. 22, ll. 14-19.) This meant the vessel understood it would receive nitrogen from Vopak at a blanketing pressure/volume and not a purge, which is a significantly higher volume.[1] (*See* Exhibit "5," at p. 8, ll. 2-16, 22-25 to p. 9., l. 1-2.)

5.      What Vopak failed to provide the vessel with during the Key Meeting on the day of the incident was its Nitrogen Supply Acknowledgement Form. (*See* Exhibit "1" at p. 18, ll. 18-21; Exhibit "5" at p. 22, ll. 20-25 to p. 23, ll. 1-11.) On that form is information that had it been

---

[1]     A nitrogen blanket provides a pad over the cargo to keep it pure. As cargo is discharged from the tank, nitrogen is introduced to fill the tank space above the remaining cargo. On the other hand, a nitrogen purge is going into an empty tank at a high volume in order to clear the tank of impurities for the cargo to be received. (*See* Exhibit "1" at p. 21, ll. 23-25 to p. 22, ll. 1-19.)

provided to the vessel, the over-pressurization of its cargo tanks would not have occurred. (*See* Exhibit "5"at p. 16, ll. 21-24.) Specifically, the Nitrogen Supply Acknowledgement Form clearly and unambiguously states the difference between its supplying nitrogen for a purge operation as opposed to a blanket:

      Nitrogen purge operation: 7,000 m3/hour volume

      Nitrogen blanketing/pad: 504 m3/hour volume

(*See* Exhibit "6," Vopak Nitrogen Supply Acknowledgment Form.)

    6.    There is contradictory testimony between Vopak personnel as to why the Nitrogen Supply form was not brought to the vessel on May 30, 2019. At the time of the incident, Patrick Bryan was the Operations Manager for Vopak Deer Park and was responsible for the policies and procedures at the terminal related to nitrogen handling. (*See* Exhibit "7," Deposition of Patrick Bryan at p. 10, ll. 4-7, p. 11, ll. 12-25.) On May 30, 2019, Mr. Bryan was "under the impression" and had "assumed" the Nitrogen Supply Form was being used for all nitrogen movements whether for a blanket or a purge. (*See id*. at p. 14, ll. 16-24, p. 15, ll. 1-23.) However, Mr. Ramirez indicated that Vopak would not bring the form when the nitrogen operation was for a cargo discharge. (*See* Exhibit "1" at p. 18, ll. 18-24.) And Mr. Zwahr offered a third opinion on when the Nitrogen Supply Form was used and that was only for purging operations. (*See* Exhibit "4" at p. 20, ll. 20-25 to p. 21, ll. 1-4.)

    7.    Despite the fact that none of the Vopak personnel who have been deposed could agree on when the Nitrogen Supply Form should be used or not, it was Mr. Bryan, as Operations Manager, who testified that use of the form ***"was something that should have been in place"*** for any nitrogen movement, "no matter how large or small." (*See* Exhibit "7" at p. 15, ll. 1-8) (emphasis added.) That became Vopak's policy immediately after the incident.

8. There is also contradictory testimony from Vopak personnel concerning the hose size to be used during the nitrogen supply and what effect it has. Vopak's Work Instruction for the movement called for maintaining nitrogen pressure and that the terminal "MUST USE A 2" N2 HOSE." (*See* Exhibit "8," Work Instruction) (emphasis in original). Mr. Ramirez believed the requirement for use of the 2" hose was for the movement of nitrogen into Vopak's cargo tank. (*See* Exhibit "1" at p. 39, ll. 7-23.) Mr. Bryan, however, testified that it was his view that a 2" hose was required to be used for supplying nitrogen to the vessel. (*See* Exhibit "7" at p. 29, ll. 9-25 to p. 30, ll. 1-7.)

9. For the operation at issue, Vopak deviated from its Work Instruction Requirement and connected a 4" hose for the supply of nitrogen to the vessel as opposed to the 2" hose. (*See* Exhibit "4" at p. 47, ll. 15-18; Exhibit "9," Hose layout for cargo movement.) Mr. Zwahr maintained that it did not matter what size hose was used for the nitrogen supply and that the hose size was "irrelevant." (*See* Exhibit "4" at p. 25, 10-15; p. 42, l. 25 to p. 43, ll. 1-5.) If the size of hose was "irrelevant," Mr. Zwahr had no explanation as to why the Work Instruction would require the use of a 2" hose for the nitrogen supply. (*See id*. at p. 43, ll. 6-10; p. 44, ll. 7-11.). Conversely, Mr. Ramirez acknowledged that the size of the hose would affect the volume of nitrogen that would be introduced to the vessel. (*See* Exhibit "1" at p. 29, ll. 10-19.) In other words, the larger the hose, the greater the volume of nitrogen that would be supplied to the ship.

10. Following the incident and after the *Fairchem Filly's* tanks were over-pressurized, Vopak reverted back to its original Work Instruction and replaced the 4" hose with the required 2" hose. (*See* Exhibit "10," Vopak e-mail dated June 1, 2029.)

11. There was also confusion amongst Vopak personnel over whether the terminal had the ability to control the volume of nitrogen supplied to the vessel. Vopak maintained an Operating

Narrative for Supplying Nitrogen to Marine Vessels. It is undated and does not reference any dates for additions or revisions. (*See* Exhibit "11," Vopak's Operating Narrative for Supplying Nitrogent.) At Section V of the Narrative, it provides: "Flow orifice plates, **with specific design flow capabilities** have been installed on each of the flow meters located at the dock." (*See id*. at Section V.) (emphasis added).

12. Mr. Zwahr testified that at no point does Vopak control flow from the shoreside whether by use of a reducer or other means. (*See* Exhibit "4" at p. 25, ll. 22-25 to p. 26, ll. 1-2.) However, Mr. Ramirez agreed that a flow orifice plate would reduce the volume of nitrogen supplied by the terminal to a vessel. (*See* Exhibit "1," at p. 41, ll. 23-25 to p. 42, ll. 1-11; p. 43, ll. 6-11.) In the operation at issue, Mr. Ramirez agreed that Vopak could have used a flow orifice plate to achieve a flow rate consistent with a blanketing operation that was agreed to during Key Meeting and consistent with Vopak's Nitrogen Supply Form:

> Q: Okay. And so in this particular case, if Vopak wanted to achieve a flow rate consistent with a blanketing operation as set out on the acknowledgement form, it could have used a flow orifice plate to do that. It could have.
>
> Mr. Nork: Object to form.
>
> A: Yes.

(*See* Exhibit "1" at p. 44, ll. 8-14.)

13. However, Vopak did not use a flow orifice plate at the time it supplied nitrogen to the *Fairchem Filly*. (*See* Exhibit "1" at p. 45, 10-13.) Whether the flow orifice plate section of the Operating Narrative was in effect at the time of the incident is also subject to conflicting views by Vopak's personnel. Mr. Ramirez believed that the Operating Narrative had been revised and that the addition of orifice plates to control volume from the terminal-side was added after the over-pressurization incident with the *Fairchem Filly*. (*See id*. at p. 45, ll. 20-25 to p. 46, ll. 1-7.) Mr.

Bryan, who as Operations Manager was responsible for policies and procedures at Vopak Deer Park, was "not confident" that Mr. Ramirez was correct and could not recall whether the flow orifice plate section was added to the Operating Narrative after the incident. (*See* Exhibit "7" at p. 26, ll. 4-15.)

14.     Against that backdrop, commencement of the discharge operations began at 0705 LT on May 30, 2019. (*See* Exhibit "12," Statement of C/O Nyan.) At 0745, the instruction to open the manifold and introduce nitrogen to the cargo tanks was given. Three minutes later, the vessel's tank ruptured causing over $2,000,000.00 in damage to the *Fairchem Filly* and its interests. (*See id*.; D.E. No. 1 at ¶ 16.).

15.     There can be no serious dispute that contrary to its multiple representations that it would supply nitrogen blanketing, Vopak instead supplied the *Fairchem Filly* with a nitrogen purge that was far in excess of that vessel could have received. (*See* Exhibit "13," Deposition of Ajit Natu at p. 52, 14-22.) The vessel's valve venting capacity at the time of the cargo operation at issue was 966 cubic meters per hour. Had Vopak supplied the nitrogen at the blanketing pressure and volume it represented it would do, the **maximum** volume the vessel would have received was 504 cubic meters per hour and this incident would not have occurred. (*See* Exhibit "6," Exhibit "13" at p. 70, ll. 22-25 to p. 71, ll. 1-24; p. 74, ll. 18-25 to p. 75, ll. 1-18.) It became clear to vessel interests that Vopak supplied a nitrogen purge when within three minutes, the nitrogen pressure on the ship's tanks went from 0 kPa to more than 100 kPa. This meant the nitrogen flow far exceeded the 504 cubic meters for a blanket operation.[2] (*See* Exhibit "13" at p. 71, l. 25 to p. 72,

---

[2]     After the damage was done, Mr. Ramirez, who was not present for the cargo operation, claimed that he verbally advised the C/O during the Key Meeting that a 4" nitrogen hose would be used, and that the vessel was in control of the nitrogen. This is disputed by the C/O and there is no documentation from the Key Meeting that supports these contentions. (*See* Exhibit "5" at p. 8, ll. 2-16; p. 9, ll. 3-8; p. 15, ll. 1-12.)

ll. 1-24.)

## II.
## SUMMARY JUDGMENT STANDARD

16. Vopak has the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiffs contend that based on the evidence and facts set forth above, Vopak has fallen woefully short of its burden. However, in the event that this Court finds an absence of evidence supporting Plaintiffs' case, then Plaintiffs bear the burden to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Plaintiffs contend that they met their burden.

## III.
## ARGUMENT

**A. Objection to the Affidavit of Rigoberto Ramirez**

17. Plaintiffs object to the August 14, 2023, affidavit of Rigoberto Ramirez, submitted in support of Vopak's Motion for Summary Judgement. (*See* D.E. No. 26-2.) The affidavit is not credible and is a self-serving sham, which this Court should disregard at the summary judgment stage.

18. Mr. Ramirez was deposed on June 7, 2023. (*See* D.E. No. 26-1.) Under direct examination from Vopak's counsel, he was explicitly asked what he told the C/O during the Key Meeting that was held prior to the cargo discharge at issue:

> Q: Okay. What did you tell him – during your key meeting with him in the cargo control room, what did you tell him regarding nitrogen operations that were going to occur during cargo operations?
>
> A: So I told him that we're going to connect the nitrogen supply for the hexene product and that they will be in control at their manifold of the nitrogen, that they had to use while discharging.

(*See* Exhibit "1" at p. 47, ll. 18-25.)

19. Nowhere in his answer did Mr. Ramirez state that he advised the crew that Vopak would connect a 4" hose and provide nitrogen at 100-110 psi. *Id.* Furthermore, he had the opportunity to sign an errata sheet to clarify any answers from his testimony and did not do so.

20. Now, two months after his deposition, and on the eve of the deadline for dispositive motions, Mr. Ramirez provides an affidavit with new, self-serving testimony in support of Vopak's motion. The affidavit includes inconsistent testimony; specifically, that he "advised the chief officer that nitrogen would be supplied by Vopak through a 4-inch hose connected to the vessel's manifold" and that "the nitrogen pressure would be 100 to 110 psi." (*See* D.E. No. 26-2.)

21. The sham affidavit doctrine prevents a party who has been deposed from introducing an affidavit that contradicts that person's deposition testimony without explanation. *Free v. Wal-Mart Louisiana, L.L.C.*, 815 Fed. Appx. 765 (5th Cir. 2020). When the affidavit testimony includes novel comments that are central to an issue that the affiant has already been thoroughly deposed on, then the statements are considered inconsistent rather than supplemental and should be stricken. *See Free* at 766-767.

22. The *Free* case presented the same issue as this, where the affiant, after being thoroughly deposed concerning a conversation, included statements allegedly said during the conversation that were not provided during the deposition. *Id.* The Fifth Circuit affirmed the district court's decision to strike the affidavit and found it notable that the affidavit failed to provide any explanation for the new testimony. Likewise, Mr. Ramirez's affidavit contains no explanation for why he is giving new testimony concerning what he said during the Key Meeting when he was deposed on that issue many months ago.

23. For these reasons, Plaintiffs request that this Court strike the affidavit of Rigoberto Ramirez.

**B.  The Wharfinger Duty does not apply to this case.**

24. As an initial matter, it is relevant to highlight that Vopak's motion is premised upon its gross mischaracterization of Plaintiffs' claims. Specifically, in its Introduction, Vopak falsely asserts that "Plaintiffs' sole claim against Vopak is that Vopak ***breached its wharfinger's duty to warn of a hidden hazard.***" (D.E. No. 26 at §1) (emphasis added).

25. This is not a case of a "hidden hazard;" this is a case where Vopak failed to do what it said in writing it was going to do (i.e., supply the *Fairchem Filly* with a nitrogen blanket as opposed to nitrogen purge.) In other words, Vopak said in writing it would do one thing, yet it did another that resulted in a tank rupture causing $2 million worth of damage.

26. Even a cursory review of Plaintiffs' Complaint belies Vopak's contention that this claim involves a "hidden hazard:"

> ● **Negligence Under General Maritime Law:** Vopak owed the M/T Fairchem Filly and its interests a legal duty under the general maritime law to reasonably and competently perform the shore-side supply of nitrogen for the cargo discharge operation. Vopak breached this duty by failing to provide the nitrogen at blanketing pressure as it indicated on several pre-cargo operation checklists, failing to use all available means to avoid the risk of releasing nitrogen at purging pressure, failing to provide the vessel with Vopak's Nitrogen Supply Acknowledgement form, and other acts of negligence which will be shown more particularly at trial. These acts and omissions on the part of Vopak caused damage to HSL and Fleet.
>
> ● **Breach of Express/Implied Warranty of Workmanlike Performance:** Vopak failed to provide terminal services in a good and workmanlike manner. Vopak's PICs performed incompetently, failed to ensure that the nitrogen supply from shore was provided at the agreed-upon blanket pressure, and caused damage to the vessel equipment, which had to be repaired by a third-party vendor at additional cost to HSL and Fleet, and which also led to cargo damage, delays and loss of hire. As such, Vopak breached the express and implied warranty of workmanlike performance and should be liable for all reasonable direct and consequential damages that flowed from its breach.

- **Contribution under General Maritime Law:** As a result of Vopak's acts, omissions, and breaches of warranty, the cargo aboard the M/T Fairchem Filly was damaged resulting in claims against vessel interests. By including all potentially liable third-parties in a release with cargo interests—even though none of them contributed to the settlement—Plaintiffs preserved their common-law right to contribution under the general maritime law.

(D.E. No. 1 at ¶¶ 11, 12, and 13.)

27. Plaintiffs have clearly set out their claims against Vopak and they do not include anything about a "hidden danger" despite Vopak's attempts to recharacterize them otherwise.

28. Further, even a basic analysis of the wharfinger duty would show that it has no application to this case involving a cargo operation between a vessel and a terminal. The wharfinger duty requires that a wharfinger will exercise reasonable diligence to provide a safe berth and to warn a person lawfully using its facilities of any unexpected hazard or deficiency, including underwater obstructions at the berth or in its approaches of which it may have knowledge or should have knowledge. *Smith v. Burnett*, 173 U.S. 430 (1899); *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149 (5th Cir. 1990). The duty relates to "hidden hazards" of the physical berth that could pose a risk to vessels that come alongside. *See id*. It does not relate to a "service" the terminal provides in support of a cargo operation.

29. Even the cases cited in Vopak's motion demonstrate that the wharfinger duty relates to physical conditions of the berth provided by the wharfinger to a vessel, and chiefly involves damage to vessels involved with underwater obstructions or improper mooring equipment. *See Trade Banner Line, Inc. v. Caribbean Steamship Co. S.A.*, 521 F.2d 229, 230 (5th Cir. 1975); *Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc.*, 354 F.2d 476, 480 (4th Cir.

1966). These cases are inapposite as they do not involve any ongoing cargo operation in which the terminal actively participated.[3]

30.  On the date of the incident, Vopak was not acting as a mere wharfinger, passively providing a berth. To the contrary, Vopak was actively involved in the discharge operations of the vessel, actions which resemble the role of a stevedore, rather than a wharfinger. Furthermore, with respect to vessels being damaged by terminal operators, like Vopak, courts have routinely held that terminals owe the duty to perform in a proper, safe, and workmanlike manner, and failure to exercise reasonable care constitutes negligence. *Maurice Pincoffs Co. v. Dravo Mechling Corp.*, 697 F. Supp. 244, 249-50 (E.D. La. 1987), *aff'd sub nom. Maurice Pincoffs v. Dravo Mechling*, 880 F. 2d 411 (5th Cir. 1989).

31.  When a terminal operator damages a vessel during loading and unloading of cargo, courts utilize normal maritime negligence principles to evaluate the terminal's conduct and determine liability. *Mavirazon Companie Naviera, S.A. v. H.J. Baker & Bros Inc*, 494 F. Supp. 1023 (E.D. La. 1980) (finding that stevedores have a duty to perform work safely and properly; stevedores were negligent when unloading vessel via grabs and bulldozers that caused damage); *U.S. v. Bull S.S. Line*, 274 F.2d 877 (2d Cir. 1960) (finding that stevedores' conduct was negligent based on lack of due care when stevedores punctured the vessel while loading cargo.)

32.  Vopak was actively involved in discharging the *Fairchem Filly* as they participated in the Key Meeting, provided the nitrogen for the cargo operation, and received the vessel's cargo. While Vopak did provide a berth for the Vessel, their active participation in the cargo operation

---

[3]  Plaintiffs' counsel have found no reported decision applying the wharfinger duty to a case involving an on-going cargo operation between a terminal and a vessel. We presume, based on the cases cited in their own motion, that Vopak's counsel found none either.

places Vopak in the category of a stevedore. As such, their actions are governed by standard negligence principles, not by the wharfinger duty proposed by Vopak.

C. **There are genuine issues of material fact related to Vopak's negligence.**

33. At the risk of repeating the facts set forth in Section I *supra*, Plaintiffs have set forth numerous issues of material fact that preclude summary judgment and a dismissal of Plaintiffs' claims. Specifically:

● Vopak's PIC who was in charge of the cargo operation did **not** attend the Key Meeting. The PIC who did attend to review the procedures for the operation went off-shift and was not present for the cargo operation. (*See* Para. 2, *supra*.)

● Vopak represented to the vessel in writing that it would supply a nitrogen blanket during the cargo operation. It did not. (*See* Para. 4, *supra*.)

● There is no document from May 30, 2019, stating that the vessel was in charge of the nitrogen or that a 4" hose was going to be used by the terminal for the supply of nitrogen. (*See* Para. 3, *supra*.)

● Vopak personnel gave conflicting testimony over whether the Nitrogen Supply Acknowledgement Form should have been used for the operation at issue. It became Vopak policy to use the form for all nitrogen operations after the incident. (*See* Para. 6, *supra*.)

● Vopak personnel gave conflicting testimony over whether the requirement for a 2" inch nitrogen hose should have been used for the vessel. A 4" hose was used and a day after the incident Vopak ordered at the a 2" nitrogen hose be used. (*See* Paras. 8, 9, *supra*.)

● Vopak personnel gave conflicting testimony over whether the policy related to flow orifice plates (which would have controlled volume from the terminal-side) was in place at the time of the incident. (*See* Para. 11-13., *supra*.)

● A*fter* the incident which caused $2 million and for which he was not present for, Mr. Ramirez claims in Vopak's post-incident investigation that he had verbally told the C/O that the vessel controlled the nitrogen and that a 4" hose would be used. Not only is this self-serving and convenient; it is disputed by the C/O.

● It cannot reasonably be disputed that Vopak supplied the vessel with a nitrogen purge as opposed the agreed upon nitrogen blanket. (*See* Para. 15, *supra*.)

34. Even if this Court believes that Vopak met its initial summary judgment burden, Plaintiffs have more than met their burden by raising multiple, genuine issues of material fact that warrant a trial on the merits of their claims.

For these reasons, Plaintiffs respectfully request that Vopak's Motion for Summary Judgment be denied; that Plaintiffs' claims proceed to trial; and, that Plaintiffs be awarded all other and further relief to which they may show themselves justly entitled to receive.

Respectfully submitted,

/s/ *James T. Bailey*
Robert L. Klawetter
Federal I.D. No. 2471
State Bar No. 11554700
rklawetter@sbsb-eastham.com
James T. Bailey
Federal I.D. No. 30347
State Bar No. 24031711
jbailey@sbsb-eastham.com
Dylan S. Hoke
Federal I.D. No. 38220027
State Bar No. 24126961
dhoke@sbsb-eastham.com
1001 McKinney Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 225-0905
Facsimile: (713) 574-2942

*Attorneys for Plaintiffs,*
*HSL Filly Shipping Limited and*
*Fleet Management Limited*

OF COUNSEL:

SCHOUEST, BAMDAS, SOSHEA, BENMAIER & EASTHAM PLLC

## **CERTIFICATE OF SERVICE**

      I certify that I filed the foregoing Response on **September 5, 2023**, electronically, and that a true and correct copy of the foregoing will be served on counsel of record via the Electronic Case Filing System of the United States District Court for the Southern District of Texas, Houston Division.

***Via Electronic Mail***
Thomas R. Nork
Alejandro Mendez-Roman
Holman, Fenwick, Willan USA LLP
5151 San Felipe, Suite 400
Houston, Texas 77056

                                                  /s/ *James T. Bailey*
                                                  James T. Bailey